UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

KOLJA VRANISKOSKA,                          )
                                            )
                Plaintiff,                  )
                                            )
        v.                                  )        Case No. 2:11-CV-308 JD
                                            )
FRANCISCAN COMMUNITIES, INC.                )
                                            )
                Defendant.                  )

## OPINION AND ORDER

Plaintiff Kolja Vraniskoska worked as an Environmental Services Technician for

Defendant Franciscan Communities, Inc. ("Franciscan") at its St. Anthony Home location

beginning in 1997, and by all accounts performed well when she was physically able to perform

her duties. In March 2008, however, while performing her job, Ms. Vraniskoska fell and suffered

an injury to her left wrist. The injury required surgery, forcing her to miss over three months of

work. Upon her return to work, she performed light duty while she continued to recuperate. Her

injury, though, left her with a permanent restriction regarding the use of her left hand, which her

doctor documented in a letter to Franciscan in February 2009. Concluding that Ms. Vraniskoska

was unable to perform her normal duties with this restriction, Franciscan put her on unpaid leave

and told her that she would have to secure another position within the organization within forty-

five days or her employment would be terminated. Though Ms. Vraniskoska sent a letter to

Franciscan protesting what she believed to be discriminatory treatment, Franciscan nonetheless

terminated her employment when she had not secured another position within that timeframe.

Ms. Vraniskoska subsequently filed her complaint in this matter alleging that Franciscan

failed to accommodate her disability, discriminated against her on account of her disability, and

retaliated against her for engaging in protected activity, all in violation of the Americans with Disabilities Act. [DE 1] Now before the Court is Franciscan's motion for summary judgment as to each of these claims. [DE 37] That motion is fully briefed [DE 38, 42, 49]. Additionally, Franciscan has moved to strike certain exhibits offered by Ms. Vraniskoska in opposition to the motion for summary judgment, [DE 50] and that motion is also fully briefed. [DE 51, 52] For the reasons that follow, Franciscan's Motion to Strike is DENIED. Franciscan's Motion for Summary Judgment, however, is hereby GRANTED.

## FACTUAL BACKGROUND

St. Anthony Home is a part of the Franciscan Sisters of Chicago Service Corporation, which provides Catholic housing healthcare. [DE 39-3 ¶¶ 2, 3] St. Anthony Home is a senior living community located in Crown Point, Indiana, and it includes both assisted living and nursing home facilities. [DE 39-3 ¶ 3] Ms. Vraniskoska was hired to work at St. Anthony Home in October of 1997 as an Environmental Services Technician ("ES Tech"), a housekeeper position. [DE 39-3 ¶ 17; DE 39-6 ¶ 11] St. Anthony Home has multiple units, each of which is comprised of a number of resident rooms in addition to common areas, and each unit is designated as either a nursing home or assisted living unit. [DE 39-8 ¶ 5] Each ES Tech is assigned to one unit, and each unit has only one ES Tech assigned to it. [DE 39-8 ¶ 5; DE 39-12 ¶ 4]

Though there is some dispute as to the precise duties of the ES Tech position, their responsibilities generally include all of the housekeeping functions within the units, including sweeping, mopping, cleaning, dusting, making beds, disinfecting surfaces, and removing trash. [DE 39-8 ¶ 9; DE 39-12 ¶ 8] In performing these tasks, ES Techs also utilize housekeeping carts, which weigh about 40 pounds and contain all of their housekeeping supplies, and linen carts,

which weigh about 80 pounds and need to be moved to and from the laundry each day stocked with fresh linens. [DE 39-8 ¶ 7; DE 39-12 ¶ 6; DE 44-3 pp. 82–83]

Ms. Vraniskoska received positive performance evaluations throughout her time as an ES Tech, and Franciscan has not alleged any fault with the quality of Ms. Vraniskoska's work. [DE 44-12 Ex. 12-I] However, in March 2008, at which time she was working in an assisted living unit, Ms. Vraniskoska fell and injured her left wrist. [DE 39-6 ¶ 15; DE 44-1 pp. 27–30; DE 44-3 p. 46] The injury required surgery, and Ms. Vraniskoska was off of work for several months while she went through physical therapy and pain management treatments. [DE 39-6 ¶ 15; DE 44-1 pp. 27–31] She returned to work three months later, but with a restriction from her doctor that she could not use her left arm at all. [DE 44-1 pp. 31–32; DE 39-6 ¶ 17] Because this restriction prevented her from completing her normal duties, Franciscan placed Ms. Vraniskoska on its Transitional Duty Program, which offered light work for employees with temporary restrictions in order to allow them to continue working as they recovered from injuries. [DE 39-3 ¶¶ 6–9; DE 39-6 ¶¶ 10, 18–22] Ms. Vraniskoska' supervisor came up with a list of tasks that she could perform within her restrictions, including dusting, wiping down resident possessions, wiping down areas of the facility, doing light trash, shredding paperwork, and hanging residents' clothes in the laundry. [DE 39-6 ¶ 19; DE 39-8 ¶ 28] Franciscan also later transferred Ms. Vraniskoska to a nursing home unit, where the manual labor was not as physically demanding. [DE 39-11 pp. 124–25; DE 44-3 pp. 46–47]

On October 13, 2008, Ms. Vraniskoska was cleared to begin using her left hand, but with the restriction that she not lift over five pounds with that hand. [DE 39-6 Ex. 9] Her doctor's note specifically cleared her for vacuuming and mopping activities, but specified that she could not make beds or carry garbage over five pounds. [*Id.*] Ms. Vraniskoska had additional follow-up

appointments in November and December 2008, and the five pound lifting restriction on her left hand remained in place. [DE 39-4 Ex. 12] These notes did not mention making beds, however, which is likely due to Ms. Vraniskoska's transfer around that time to a nursing home unit, where beds were lighter and easier to make. [DE 39-11 p. 124; DE 44-1 pp. 50–51]

Ms. Vraniskoska had a final follow-up appointment on February 2, 2009. [DE 44-12 Ex. 12-D] At that time, her doctor concluded that she had reached the point of maximum medical improvement, so he made her five-pound lifting restriction permanent. [*Id.*] The doctor also noted that "[t]he activity that seems to have issue here is working with a linen cart that forces her into heavier lifting activity, so I think that should be restricted." [*Id.*] Her work-restriction therefore stated that the five-pound limit "includes No linen cart activities." [*Id.*]

Upon learning that Ms. Vraniskoska's restrictions were permanent, Franciscan determined that she was no longer eligible for its Transitional Duty Program, which it reserved for employees recovering from temporary injuries. [DE 39-3 ¶¶ 34–35; DE 39-6 ¶ 10] Franciscan's Human Resources Manager, Ray Gonzalez, therefore reviewed Ms. Vraniskoska's restrictions and consulted with her supervisor to determine whether Ms. Vraniskoska would be able to perform the essential functions of her position and whether any reasonable accommodations existed. [DE 39-3 ¶¶ 34–49, DE 39-8 ¶¶ 64–70] Ultimately, he concluded that she could not perform her essential duties and that the only accommodation would be to hire an additional employee to permanently assist Ms. Vraniskoska perform her job, which he determined was unreasonable. [DE 39-3 ¶ 46]

On February 12, 2009, Mr. Gonzalez met with Ms. Vraniskoska and her supervisor to discuss her employment status. [DE 39-3 ¶ 50] He informed her that since her restrictions had been made permanent, she was no longer eligible for the Transitional Duty Program, and that he

had concluded that no reasonable accommodations existed that would enable her to perform her duties as an ES Tech. [DE 39-3 ¶¶ 51–55] He asked Ms. Vraniskoska if she had any suggestions or ideas about possible accommodations, and although she insisted that she was performing her job, Ms. Vraniskoska did not offer any suggestions. [DE 39-3 ¶¶ 53–54; DE 39-8 ¶¶ 73–75]

Mr. Gonzalez therefore told Ms. Vraniskoska that she was being placed on a forty-five day unpaid leave of absence, during which time she could apply for any available position within the Franciscan network. [DE 39-3 ¶ 57; DE 39-8 ¶ 79] If she was not able to find another position for which she was qualified, however, Franciscan would terminate her employment at the end of that period. [*Id.*] Mr. Gonzalez documented this conversation in a letter the following day, and attached a list of all open positions within the Franciscan network. [DE 39-3 ¶ 62] Ms. Vraniskoska was qualified for few, if any, of those positions, however, and she did not apply for any of them. [DE 39-3 ¶ 63; DE 39-4 Ex. 16; DE 39-9 p. 81]

On March 23, 2009, Ms. Vraniskoska sent a letter to Mr. Gonzalez in which she said that she was "extremely puzzled" by their meeting and that she "did not understand why no discussions have ever been held with [her] regarding the disability situation and a reasonable accommodation." [DE 39-4 Ex. 16] She also stated, "I don't think it is fair that I am being threatened with termination because of my worker's compensation claim and in violation of the protections to which I am entitled under civil rights laws." [*Id.*] Mr. Gonzalez responded to Ms. Vraniskoska by letter on April 2, 2009. [DE 39-4 Ex. 17] He noted that the forty-five day period had expired and that Ms. Vraniskoska had not secured another position, and so he stated that "effective, March 30th, 2009, your employment with Franciscan Communities – St. Anthony Home has been terminated." [*Id.*] Ms. Vraniskoska subsequently filed a Charge of

Discrimination with the Equal Employment Opportunity Commission, and upon receiving her

Dismissal and Notice of Rights, filed her complaint to initiate the present action. [DE 1]

## STANDARD OF REVIEW

On summary judgment, the burden is on the moving party to demonstrate that there "is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The Court must construe all facts in the light most favorable to the

nonmoving party, making every reasonable inference and resolving every doubt in its favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "before a non-movant can

benefit from a favorable view of the evidence, it must show some genuine evidentiary dispute."

*SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009).

The party seeking summary judgment "bears the initial responsibility of informing the

district court of the basis for its motion, and identifying" the evidence that "demonstrate[s] the

absence of [a] genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). Once the moving party meets this burden, the nonmoving party then bears the burden of

demonstrating that such a genuine issue of material fact exists. *See Harney v. Speedway*

*SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). "The nonmovant will successfully

oppose summary judgment only when it presents definite, competent evidence to rebut the

motion." *Vukadinovich v. Bd. of Sch. Trs.*, 278 F.3d 693, 699 (7th Cir. 2002) (internal quotation

and citation omitted). A dispute over a "material fact" is "genuine" if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no

reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v.*

*Harris*, 550 U.S. 372, 380 (2007).

## DISCUSSION

**A. Motion to Strike**

Before turning to the motion for summary judgment, Franciscan has objected to Ms.

Vraniskoska's submission of several exhibits in opposition to summary judgment, and has

moved to strike those exhibits. In ruling on a party's summary judgment motion, the Court will

consider the types of materials listed in Rule 56(c) and evidence that would be admissible if

offered at trial. Fed. R. Civ. P. 56(c); *see also Celotex* 477 U.S. at 324 (1986); *Patel v. Allstate*

*Ins. Co*., 105 F.3d 365, 371 n.6 (7th Cir. 1997) (declining to consider hearsay evidence in ruling

on a motion for summary judgment).  Franciscan has moved to strike three declarations offered

by Ms. Vraniskoska on the grounds that the witnesses were not properly disclosed, and has

moved to strike all documents contained in Exhibit 12 on the grounds that they were not

authenticated and are hearsay.

As an initial matter, Ms. Vraniskoska argues that Franciscan's motion to strike must be

denied as untimely. Franciscan filed the motion to strike contemporaneous to, though later on the

docket than, its reply in support of its motion for summary judgment. Citing Federal Rule of

Civil Procedure 12(f)(2), which permits a party to move to strike a pleading only "before

responding to the pleading or, if a response is not allowed, within 21 days after being served with

the pleading." Ms. Vraniskoska argues that the motion was untimely because it was not filed

before the reply brief. This argument is misplaced, however, because Franciscan's motion for

summary judgment is not a pleading, but a motion, and therefore Rule 12(f) does not apply. Fed.

R. Civ. P. 7(a) (defining pleadings finitely with a list that does not include motions). Though the

docket text of Franciscan's motion to strike describes the filing as "RULE 12(f) MOTION to

Strike . . . ," Franciscan's motion was not in fact brought under and did not rely on Rule 12(f), and was therefore timely.

### 1. Declarations

Franciscan has moved to strike the declarations of Bernice Wallace, Theresa DeWitt, and Denise Jenkins, each of whom were coworkers of Ms. Vraniskoska at Franciscan, on the grounds that Ms. Vraniskoska did not properly disclose the identity of those witnesses under Federal Rule of Civil Procedure 26(a)(1). Rule 26(a)(1) requires each party to disclose to the opposing party "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A). These disclosures must be made within fourteen days of the Rule 26(f) conference unless otherwise ordered, and parties additionally have the obligation to supplement these disclosures in a timely manner throughout discovery. Fed. R. Civ. P. 26(a)(1)(C), (e)(1)(A).

Where a party fails to comply with these obligations, "the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In considering whether a violation was justified or harmless, a court may consider: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 342 F.3d 851, 857 (7th Cir. 2003).

Franciscan argues that because two of the witnesses were not disclosed at all, and because the third was disclosed only the day prior to the close of discovery, their declarations

must not be considered. However, though Ms. Wallace was not disclosed in a 26(a)(1) disclosure until the end of discovery, she had actually been identified and referenced in several instances throughout discovery, though only by her first name. [DE 51-1] With the benefit of its personnel records, to which Ms. Vraniskoska did not have access, Franciscan likely could have identified Ms. Wallace based on the information provided and her connection to the case. A party's disclosures must only be based on information reasonably available to it, and the duty to supplement applies only where the information was not otherwise made known to the other party. Fed. R. Civ. P. 26(a)(1)(E), (e)(1)(A). To the extent Ms. Vraniskoska violated any obligation in failing to identify Ms. Wallace more precisely, the exclusion of her declaration is unwarranted. There is no suggestion of bad faith, as plaintiff's counsel was not able to personally contact Ms. Wallace until January 2013. Any prejudice is also limited since Ms. Wallace is merely a lay witness who Franciscan could have identified themselves, and Franciscan could request leave to depose her prior to trial if necessary. Finally, there is no risk of disruption of trial because, since summary judgment is being granted, there will be none.

The declarations of Denise Jenkins and Theresa DeWitt will not be stricken, either. Though they were not disclosed, plaintiff's counsel had not learned of their identities until January 2013, after Franciscan had already moved for summary judgment, and Franciscan has identified no prejudice it would not have suffered had the witnesses been disclosed immediately instead of upon Ms. Vraniskoska's response to its motion for summary judgment. Their declarations are nearly verbatim to Ms. Wallace's, further minimizing any prejudice, at least at this stage. Finally, as with Ms. Wallace, these witnesses could have been deposed before trial if necessary, but it will not come to that since summary judgment is being granted anyway, making the error harmless. Franciscan's motion to strike is therefore denied as to these declarations.

### 2. Exhibit 12

Franciscan also moves to strike Ms. Vraniskoska's Exhibit 12 in full because it is comprised of documents without any supporting affidavits. Typically such documents are inadmissible because documents must be authenticated in order to properly be considered at summary judgment. *Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 495–96 (7th Cir. 2006). However, as Ms. Vraniskoska notes and Franciscan concedes, Franciscan itself offered and authenticated many of these same documents in support of its motion for summary judgment, so Franciscan has withdrawn its objection as to those documents. [DE 52 p. 9 n.7] *Thonangsinh v. Bd. of Educ.*, 462 F.3d 762, 778 (7th Cir. 2006) (making an exception for the authentication requirement "when the party challenging the document's admissibility relied on that same document"). As to the remaining documents, they were indeed lacking in that they were not authenticated. In response to the motion to strike, however, Ms. Vraniskoska's counsel has provided a declaration in which he states under penalty of perjury that all such documents were produced by Franciscan in discovery. [DE 51-1 ¶ 11] Production of a document by an opposing party is "implicit authentication," so this declaration suffices as authentication. *BASF Corp. v. Aristo, Inc.*, 872 F. Supp. 2d 758, 769 (N.D. Ind. 2012) (quoting *United States v. Lawrence*, 934 F.2d 868, 870–72 (7th Cir. 1991)). Although the Court is not obligated to consider this belated declaration, it is within this Court's discretion, *see* Fed. R. Civ. P. 56(e)(1) (permitting a court to give a party an opportunity to properly support a fact), and the Court therefore declines to strike these documents for failure to authenticate.

To the extent that Franciscan also intends to argue that the substance of the documents is hearsay, not just that the failure to authenticate them renders them hearsay, its blanket assertion, elaborated on in three conclusory sentences, that the 128-page exhibit is entirely inadmissible as

hearsay is wholly insufficient to support its motion. A document (much less an exhibit composed of many documents) is not inadmissible in its entirety merely because it may contain hearsay. *See Owner Operator Res., Inc. v. Maag*, No. 1:02-CV-332, 2003 WL 21911061, at *2 (N.D. Ind. Mar. 28, 2003) (striking only the inadmissible portions of an affidavit). Further, for evidence to be inadmissible hearsay, it must be a statement offered for the truth of the matter asserted, even before looking to whether an exemption or exception applies. Fed. R. Evid. 801(c). Franciscan's motion did not identify what in any of the documents is hearsay or why, though it appears that little if anything contained in the exhibit would fit that category. For example, the Reasonable Accommodation Record completed as to Ms. Vraniskoska is certainly not offered for the truth of the assertion that Ms. Vraniskoska cannot perform essential functions of her position or that no accommodations are possible. Because Franciscan's motion failed to identify or analyze even a single specific instance as to how or why this objection applied, its request will be denied outright as to this issue. *See* Fed. R. Civ. P. 7(b)(1) (stating that a motion must "state with particularity the grounds for seeking the order").

## B. Motion for Summary Judgment

Moving to the substance of Ms. Vraniskoska's claims, her complaint sets forth three claims. Count I encompasses claims for failure to accommodate her disability and for disparate treatment on account of her disability, and Count II alleges retaliation on account of her protected activity. Franciscan has moved for summary judgment as to each claim, and for the following reasons, that motion is granted.

### 1. Disability Discrimination

Ms. Vraniskoska's claims under Count I are brought under a provision of the Americans with Disabilities Act that prohibits an employer from discriminating against "a qualified

individual on the basis of disability." 42 U.S.C. § 12112(a). Thus, the threshold question for these claims is whether Ms. Vraniskoska is a "qualified individual" and has a "disability." *Id.*; *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 195 (7th Cir. 2011). The parties do not contest whether Ms. Vraniskoska has a disability, but vigorously dispute whether she is a qualified individual. A "qualified individual" is an individual "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Essential functions" means "the fundamental job duties of the employment position the individual with a disability holds," and "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). A particular job function may be essential because the reason the position exists is to perform that function, or because of the limited number of employees who could perform that function, among other reasons. 29 C.F.R. § 1630.2(n)(2).

Evidence relevant to determining essential functions of a position includes the written job descriptions, the employer's judgment of a position, the amount of time spent performing a function, the consequences of not requiring the employee to perform the function, and the current and past work experiences for the position at issue. 29 C.F.R. § 1630.2(n)(3). However, an employer is entitled to substantial deference in determining the essential functions of its positions: "Although we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions, we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job." *DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998).

Ms. Vraniskoska had several functions that comprised her job as an ES Tech, and the parties dispute as to just about every one of them whether it was essential or whether she could

12

perform it. There is one function, however, for which there is no genuine dispute, namely transportation of the linen cart, and Ms. Vraniskoska is therefore unable to proceed past summary judgment on these claims. Each day, each ES Tech is required to take a linen cart stocked with fresh linens and transport it from the laundry to their unit by pushing or pulling it down the hall. [DE 44-1 pp. 63, 65; DE 44-3 pp. 82–83] During the day, the linen cart remains stationary as the ES Tech takes fresh linens from the cart. [*Id.*] At the end of the day, the ES Tech must push the linen cart back to the laundry. [*Id.*] Transporting the linen cart took approximately fifteen minutes each day. [DE 44-9, -10, -11 ¶ 14] Because the linen cart weighed about 80 pounds, Ms. Vraniskoska was unable to move it to and from the laundry after her injury. [DE 39-8 ¶ 7; DE 39-9 pp. 47–48; DE 44-9, -10, -11 ¶ 14]

Because Ms. Vraniskoska was unable to complete this task, in order to receive protection under the ADA, she must be able to show either that this task is not essential, or that she can complete it with reasonable accommodations. *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996). Ms. Vraniskoska argues both points, but because the only accommodation she suggests is to have someone else perform this task for her, resolution of this issue will depend on whether the task is an essential function, as "reasonable accommodation does not encompass reallocation of essential job functions." *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 913 (7th Cir. 1996); *see also Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002) (holding that an accommodation was unreasonable where it would require another person to perform an essential function of the employee's job); *Siebens v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1022 (7th Cir. 1997) (holding that an accommodation was unreasonable where it would have required the employer to have someone else perform some of the plaintiff's duties); 29 C.F.R. § 1630 App. ("An employer or other covered entity is not required to reallocate essential functions.").

13

As to whether this task is an essential function of the ES Tech position, Franciscan has produced sufficient evidence to establish that it is. Transporting the linen cart is necessary for ES Techs to be able to perform their jobs, as their daily responsibilities include replacing linens, and they can only do this if the cart with fresh linens is transported to their unit. [DE 39-8 ¶¶ 7, 9, 68, 69; DE 39-12 ¶¶ 6, 8, 40, 41; DE 44-3 pp. 82–83] Franciscan has further shown that it has allocated this task to the ES Tech position specifically. Though the Position Description does not specifically reference transportation of the linen cart, it states that the physical demands of the ES Tech position include "pushing" and "pulling (in excess of 50 lbs)." [DE 39-3 Ex. 4] Donna Yanders and Patricia Walton, the Environmental Services Manager and Team Leader, respectively, also stated that "[w]orking with and managing the linen cart" was an essential function of the ES Tech position. [DE 39-8 ¶ 69; DE 39-12 ¶ 41] In addition, replacing the linens in residents' rooms, for which transportation of the linen cart is a necessary task, is also an essential function of the ES Tech position. [DE 39-8 ¶ 68; DE 39-12 ¶ 40]

Because an employer is entitled to substantial deference in determining the essential functions of its positions, once Franciscan has made this showing, this Court's review is limited to determining whether the stated function exists in practice as well, and whether Franciscan has a valid reason for including it among the various duties of the ES Tech position. *DePaoli*, 140 F.3d at 674; *Basith v. Cook Cnty.*, 241 F.3d 919, 929 (7th Cir. 2001). However, Ms. Vraniskoska has not created a genuine dispute as to either question.

First, Ms. Vraniskoska has failed to produce evidence creating a genuine question as to whether Franciscan's "understanding of the essential functions of the job is incorrect." *Basith*, 241 F.3d at 928. In her support, she submitted declarations from three of her former coworkers, each of which states: "The linen carts were difficult to push and often other male staffers would

14

help me and other techs move them." [DE 44-9, -10, -11 ¶ 15] However, these statements do not assert that the responsibility actually belonged to the "other male staffers," that the ES Techs were unable to move the cart without this help, or that they were not expected to accomplish this task absent the help. These statements therefore do not suggest that Franciscan was mistaken in asserting that it had allocated this function to the ES Techs and that it expected them to be able to complete the task. *See Dargis v. Sheahan*, 526 F.3d 981, 987–88 (7th Cir. 2008) (holding that the legitimacy of an employer's expectations was not undercut where the employees as to whom the employer relaxed the expectation in question could have performed the duty if necessary).

Ms. Vraniskoska also suggests that transporting the linen cart was not an essential function since Franciscan assigned another individual to do this for her following her injury. However, the fact that Franciscan had accommodated Ms. Vraniskoska during this period is not evidence that it altered the essential functions of the position. *Basith*, 241 F.3d at 930 ("[W]e do not believe it wise to consider the special assignment as proof that delivery was not an essential function because it would punish Cook County for going beyond the ADA's requirements."). Ms. Vraniskoska's assertions that she was taken off of the Transitional Duty Program are unsupported by the record, so this argument does not succeed.

Ms. Vraniskoska's primary argument on this point, however, is that while it may be essential that ES Techs or other staff members *collectively* transport the linen carts each day, it is not essential that *she* perform this task individually. On this question, Ms. Vraniskoska relies heavily on *Miller v. Illinois Department of Transportation*, 643 F.3d 190 (7th Cir. 2011). In *Miller*, a highway maintainer worked on a bridge crew along with three other highway maintainers and a bridge technician. *Id.* at 192. The bridge crew's tasks were assigned collectively, and it worked as a team to complete its duties. *Id.* at 192–93. Miller had a fear of

heights that prevented him from performing certain of the crew's duties, but the crew informally accommodated Miller's condition for several years by having other crew members perform those limited tasks. *Id.* After four years without incident, however, Mr. Miller suffered a panic attack after being asked to work in an elevated and exposed position, so Miller requested a formal accommodation that he not be required to work at heights above twenty feet in an exposed, extreme position. *Id.* at 193. His employer denied this request, asserting that working in such conditions was an essential function of the position. *Id.* at 193–94.

The Seventh Circuit disagreed. It held that while it may be essential for *some* member of the crew to perform those functions, it was not essential that *each* member of the crew do so. *Id.* at 198. It found that the evidence suggested that the tasks were assigned to the crew collectively, not to the members individually, since "[n]o one person was assigned permanently to any one task" and there was no expectation or requirement that the crew members rotate through the tasks. *Id.* The crew had regularly accommodated each other's strengths, weaknesses, and limitations by allocating the duties among themselves, and despite the various limitations of its members, the crew as a whole was capable of accomplishing each of its essential functions. *Id.* at 200. Thus, the court held that working at heights was not an essential function of Mr. Miller's position, even if it was essential for the crew collectively. *Id.* at 198–200.

The record here does not support Ms. Vraniskoska's reliance on *Miller*, however. Whereas the bridge crews in *Miller* were collectively tasked with the maintenance of bridges, Ms. Vraniskoska was specifically assigned to a particular unit, and she was the only ES Tech assigned to that unit. [DE 39-8 ¶ 5; DE 39-11 pp. 33–34; DE 39-12 ¶ 4; DE 44-3, p. 42 ("Everybody's obligated to do their own job."), p. 81 ("Q: [Ms. Vraniskoska] had her unit to clean, as did the other techs have their own units to clean; correct? A: Yes.")] She has provided

16

no evidence suggesting that anyone else was jointly responsible for that unit. Rather, she has submitted declarations stating that ES Techs "often helped one another and worked as an informal 'team' in jointly performing their individual job responsibilities with multiple techs working together and sharing tasks by one doing one thing and one doing another in cleaning rooms or other areas on a unit." [DE 44-9, -10, -11, ¶ 20]

This sort of collegiality and helpfulness is commendable, but it fails to establish that the essential functions belonged to the "team" collectively rather than to each ES Tech individually. The holding in *Miller* was based on the fact that the duties were assigned to the team as a whole, not to each individual member, and that no person was individually assigned to any one specific task. 643 F.3d at 198. Just the opposite is the case here, where each ES Tech is assigned to one specific unit and each unit has only one ES Tech assigned to it. [DE 39-8 ¶ 5; DE 39-12 ¶ 4] The declarations even concede this in referencing the ES Techs' "individual job responsibilities." [DE 44-9, -10, -11, ¶ 20] Thus, *Miller* is inapplicable here, and Ms. Vraniskoska has therefore failed to create a genuine dispute as to whether transporting the linen cart exists as an essential function of the ES Tech position in practice.

Second, Ms. Vraniskoska has produced no evidence suggesting that Franciscan had a pretextual reason for including transportation of the linen cart among the ES Tech's essential duties. An employer is entitled to wide deference in setting the duties for each of its positions, and a court will not interfere unless it appears that an employer has allocated duties for pretextual reasons. *Basith*, 241 F.3d at 929; *DePaoli*, 140 F.3d at 674.  In an analogous case, a pharmacy technician in *Basith* suffered an injury that left him unable to deliver medication throughout the facility. 241 F.3d at 928. This task took only about forty-five minutes to one hour out of each shift, and the plaintiff was able to complete the remainder of his position's duties. *Id.* The court,

however, declined to hold that the function was not essential merely because it could be delegated to another employee. *Id.* at 929–30. The court held that "the evidence established that delivery of medications to the patients is essential to the functioning of the pharmacy, and Cook County determined that the [plaintiff's position] was the best position to fulfill this need." *Id.* at 929. It therefore affirmed the holding that delivery of the medication was an essential function of the plaintiff's position. *Id.* at 930.

This directly parallels the present case. Transporting the linen cart is essential to the proper housekeeping of the units, since linens must be replaced on a daily basis. [DE 39-8 ¶ 9; DE 39-12 ¶ 8] Franciscan has additionally determined that ES Techs are the best position to fulfill this need, as they are the ones that are responsible for each unit's housekeeping and are the ones who primarily utilize the linens. [DE 39-3 Ex. 4; DE 39-8 ¶¶ 9, 68–69; DE 39-12 ¶¶ 8, 40–41; DE 44-1 p. 63; DE 44-3 p. 82] The fact that Franciscan could ask other employees to perform this function does not render it nonessential: "It is possible that any function, whether or not essential, could be assigned to additional employees. The mere fact that others could do [an employee's] work does not show that the work is nonessential." *Basith*, 241 F.3d at 929. In other words, it does not have to be necessary for an employer to allocate duties in a certain way, so long as it has a valid reason for doing so. *See Hansen v. Henderson*, 223 F.3d 521, 524 (7th Cir. 2000) ("The design of the job is a prerogative of management . . . ."). Thus, the fact that Franciscan could conceivably transfer this task to other employees does not mean that it is not an essential task of the ES Tech position.

The court in *Basith* also addressed the fact that the task in question took only a small portion of the employee's time. While it noted that the amount of time spent on a function can be considered in determining a position's essential functions, the court held that "an essential

18

function need not encompass the majority of an employee's time, or even a significant quantity of time, to be essential." *Id.* at 929. Because "someone—if not the technician—would have to devote one hour to the essential function" of making the deliveries, the court held that it was an essential function of the position. *Id.* at 929 n.2. Here, Ms. Vraniskoska has offered evidence that transporting the linen cart took only fifteen minutes each day. [DE 44-9, -10, -11 ¶ 14] However, if she could not do it, then someone else would have to, which she has acknowledged. [DE 39-9 p. 66; DE 44-9, -10, -11 ¶ 15] Additionally, because there were multiple ES Techs, each of whom needs to transport the linen cart to their unit, this task would be more substantial in the aggregate if reallocated to another position.  The relatively short duration of this task therefore does not affect the determination that it is essential.

In sum, there is no genuine dispute that transporting the linen cart is an essential function of Ms. Vraniskoska's position and that she is unable to perform that function, either with or without reasonable accommodation. As a result, she is not considered a "qualified individual" for this position under the ADA, and does not fall within the ADA's protections. Although a reasonable accommodation can include a transfer to a position for which the employee is qualified, Ms. Vraniskoska has identified no such position here, and did not apply to any position when given the opportunity, so she cannot claim that Franciscan failed to accommodate her. *Hansen*, 233 F.3d 523. Summary judgment must therefore be granted as to Count I of Ms. Vraniskoska's complaint, including her claims for failure to accommodate and disparate treatment under the ADA.

### 2. Retaliation

Ms. Vraniskoska has also alleged that the termination of her employment was unlawful retaliation on account of the letter that she sent to Franciscan on March 23, 2009. The ADA

prohibits retaliation against any individual "because such individual has opposed any act or practice made unlawful" by the ADA. 42 U.S.C. § 12203(a). To establish such a claim, a plaintiff must show that (1) they engaged in a statutorily protected activity; (2) they suffered an adverse employment action; and (3) a causal connection exists between the two. *Moser v. Ind. Dep't of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005). Alternatively, a plaintiff can also proceed under the indirect, burden-shifting method. *Id.* As an initial matter, the fact that Ms. Vraniskoska has not ultimately produced evidence sufficient to support her claim of ADA discrimination does not foreclose her retaliation claim: "The Act prohibits an employer from retaliating against an employee who has raised an ADA claim, whether or not that employee ultimately succeeds on the merits of that claim." *Squibb v. Memorial Medical Cntr.*, 497 F.3d 775, 786 (7th Cir. 2007).

However, Ms. Vraniskoska is unable to create a triable issue of fact as to her retaliation claim, either, so summary judgment is appropriate here as well. The only relevant facts as to this claim are uncontested. On February 12, 2009, Franciscan told Ms. Vraniskoska that she was being placed on unpaid leave, and that her employment would be terminated if she had not found and secured another position within forty-five days. [DE 39-3 ¶¶ 50–56; DE 39-8 ¶ 79; DE 44-2 pp. 52–53] It followed up with a letter to the same effect the following day. [DE 39-3 ¶ 62, Ex. 15] The propriety of this action is not pertinent to this claim, as it occurred prior to any protected activity. On March 23, 2009, Ms. Vraniskoska sent a letter to Franciscan in which she asserted that Franciscan's actions were "in violation of the protections to which [she is] entitled under civil rights laws." [DE 39-3 Ex. 16] The parties do not dispute that this constitutes protected activity. Franciscan then responded by letter on April 2, 2009, stating that Ms. Vraniskoska's

employment had been terminated on March 29, 2009, because she had not secured an alternate position within the forty-five day period provided for her. [DE 39-3 Ex. 17]

Ms. Vraniskoska asserts that regardless of Franciscan's statement on February 12, 2009, that it intended on terminating her employment within forty-five days if she had not secured an alternate position, the fact that it fired her just one week after receiving the letter objecting to her treatment as discriminatory raises an inference of retaliation. This is simply not the case. Ms. Vraniskoska was told in no uncertain terms on February 12, 2009, and again on February 13, 2009, that she had forty-five days within which to find a new position or her employment would be terminated. [DE 39-3 ¶¶ 50–56, 62, Ex. 15; DE 44-2 pp. 52–53] She was also removed from her position and placed on unpaid leave during that time. [DE 39-3 ¶ 61] In terminating her employment at the end of that period, Franciscan was merely following through with exactly what it said it would do forty-five days earlier, long before Ms. Vraniskoska engaged in any protected activity. There is therefore simply no inference that can be drawn based on this sequence of events that her employment was terminated in retaliation for her protected activity.

Ms. Vraniskoska fares no better under the indirect burden-shifting framework. A prima facie case requires a plaintiff to show that (1) she engaged in a statutorily protected activity; (2) she met the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in protected activity. *Moser*, 406 F.3d at 903. The parties agree that Ms. Vraniskoska suffered an adverse job action and that she had participated in protected activity. However, for the reasons discussed at length *supra*, Ms. Vraniskoska is unable to show that she met Franciscan's legitimate expectations. Additionally, Ms. Vraniskoska has not identified any

similarly situated employees who received better treatment, and she is therefore unable to make out a prima facie case.

As to similarly situated employees, Ms. Vraniskoska argues that her comparators include all of the other ES Techs, and that because none of them engaged in protected activity or was fired, she has satisfied this element. The crucial fact to any comparison here, though, is that Ms. Vraniskoska had already been told that she would be fired at the time she engaged in protected activity. Thus, the most important trait in a potential comparator would be that the person had been told—prior to having engaged in protected activity—that they had to find another job or be fired. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (stating that comparators must be similar enough to the plaintiff "to allow a meaningful comparison"); *Crawford v. Ind. Harbor Belt R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006) (stating that a plaintiff must show "that the members of the comparison group are sufficiently comparable to her to suggest that she was singled out for worse treatment"). If Franciscan had given the same ultimatum to other employees but only followed through and fired those who complained about discrimination, that would provide a useful comparison that could create an inference of discrimination. Otherwise, the comparison would offer no reason to infer that the decision was for any reason other than what was previously stated to Ms. Vraniskoska. Ms. Vraniskoska has identified no such employees, however, and has therefore failed to establish a prima facie case under the indirect method. It is therefore unnecessary to proceed to the next steps of the burden-shifting framework.

Because Ms. Vraniskoska has not offered sufficient evidence to permit an inference of retaliation under either the direct or indirect methods, Franciscan's motion for summary judgment must be granted as to Count II as well.

## CONCLUSION

For the aforementioned reasons, the Court **DENIES** the Defendant's Motion to Strike.

[DE 50] However, the Court **GRANTS** the Defendant's Motion for Summary Judgment. [DE

37] Accordingly, the Clerk is **INSTRUCTED** to enter judgment for the Defendant.

SO ORDERED.

ENTERED:  August 29, 2013

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court